**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| S.C., *a minor, by and through her mother Lauren Haidon,*<br>        Plaintiff,<br><br>        v.<br><br>BRANDON DANAHER, *et al.*,<br>        Defendants. | | No. 3:25-cv-464 (SRU) |

## ORDER ON MOTIONS TO DISMISS

Plaintiff S.C., a minor, brings this action by and through her mother, Lauren Haidon ("Haidon"), arising out of the allegedly unconstitutional seizure of S.C. in 2017 and her subsequent placement with her biological father, Matthew Couloute, Jr. ("Couloute"), from September 2017 to June 2018.   *See generally* Doc. No. 61.

S.C. sues the following defendants:  (1) the Town of Bloomfield, Paul Hammick, Matthew Suplee, Zachary Klomberg, Suzanne Laiuppa, and Brendan Danaher (the "Bloomfield Defendants"); (2) the Connecticut Department of Social Services ("DSS"), Andrea B. Reeves, and Roderick Bremby (the "DSS Defendants"); and (3) the Connecticut Department of Children and Families ("DCF"), Jodi Hill-Lilly, Joette Katz, Ayesha Gaines, Deshawn Hawkins, and Aisha Gage (the "DCF Defendants").  Doc. No. 61 at 3.  Collectively, the DSS and DCF Defendants are the "State Defendants."  I refer to the Bloomfield and State Defendants together as the "Defendants."[1]

---

[1] During the June 12, 2026 hearing on the Defendants' motions to dismiss, the parties agreed on the record that DCF and DSS should be terminated as defendants and that S.C.'s claims against the individual State Defendants in their official capacities should be dismissed.  Therefore, I do not address the State Defendants' arguments related to Eleventh Amendment sovereign immunity in this ruling.

The State Defendants move to dismiss S.C.'s amended complaint under Rules 12(b)(1), 12(b)(2), and 12(b)(6).  Doc. No. 45.  The Bloomfield Defendants also move to dismiss S.C.'s amended complaint under Rule 12(b)(6).  Doc. No. 47.  S.C. opposes both motions to dismiss, arguing her suit is both timely and adequately alleges claims for relief.  Doc. No. 53-5.

For the following reasons, I **grant in part with prejudice** the State Defendants' and the Bloomfield Defendants' motions to dismiss under Rule 12(b)(6), doc. nos. 45 and 47, on the narrow grounds that S.C.'s claims are barred by statutes of limitations.  The remaining arguments in the motions are **denied in part without prejudice as moot**.

## I.    Standard of Review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof."  *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (internal quotation marks omitted) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

 "When deciding a motion to dismiss under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief."  *Zuro v. Town of Darien*, 432 F. Supp. 3d 116, 121 (D. Conn. 2020) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996)).

 Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face."  550 U.S. at 555, 570.  *See*

*also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted) (alterations adopted). Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (quotation marks omitted).

## II.    Background

### A.  Factual History

The following facts are drawn from S.C.'s second amended complaint, doc. no. 61.

#### 1.  *Abuse allegations and custodial disputes prior to the 2017 arrest*

S.C. was born in 2012. Doc. No. 61 ¶ 24. As early as June 2014, Haidon sought professional help after S.C. exhibited "disturbing behavior and vaginal irritation" following a visit with Couloute. *Id.* ¶ 82. At that time, Haidon took S.C. to the Connecticut Children's Hospital (the "hospital"), which officially diagnosed S.C. with "abuse" and "referred the matter to DCF." *Id.*

In October 2014, Haidon notified the Bloomfield Police Department (the "BPD") via a written statement documenting Couloute's "threats to kill her, his history of severe physical and sexual abuse, and his repeated boasts" that his Connecticut connections would shield him from consequences. *Id.* ¶ 84. Haidon explicitly noted in her October 2014 statement that she reported the abuse to BPD Detective Matthew Suplee ("Suplee," sued as BPD Lieutenant Suplee). *Id.*

3

In September 2015, Haidon reported to the BPD that S.C. returned from visiting Couloute with signs of sexual abuse. *Id.* ¶¶ 85-86. BPD concluded it was in S.C.'s best interest to remain with Haidon, informed Couloute of that decision, and instructed Couloute not to contact Haidon. *Id.* ¶¶ 87-88. BPD Detective Suzanne Laiuppa ("Detective Laiuppa") also "conducted a forensic interview of S.C. regarding her sexual abuse disclosures" in 2015. *Id.* ¶ 126. Detective Laiuppa's interview notes "corroborated S.C.'s disclosures." *Id.* ¶ 126. However, S.C. states those notes were "never forwarded to prosecutors or child-protective services when the warrant for Haidon was sought." *Id.* ¶¶ 126, 305-306. That nondisclosure allegedly contributed to S.C.'s removal and placement with Couloute in 2017. *Id.* BPD's involvement in S.C.'s custody continued in 2016, when Suplee concluded that "no criminal violation of custodial interference had occurred" between Haidon and Couloute. *Id.* ¶¶ 102, 151.

"On January 9, 2017, the Erie County Family Court in New York . . . issued a temporary order suspending [Couloute's] access to S.C." *Id.* ¶ 103. S.C. alleges that the Eerie County Family Court order determined that Couloute was no longer S.C.'s lawful custodian. *Id.* ¶ 106. Haidon sought the temporary order because of "Couloute's nonstop threats" to have Haidon jailed and to permanently remove S.C. from Haidon's custody. *Id.*

### 2. *Allegations against the Bloomfield Defendants regarding the 2017 arrest*

On January 11, 2027, Couloute sought out BPD Officer Brendan Danaher ("Danaher") at BPD headquarters "to initiate a criminal investigation" against Haidon for custodial interference. Doc. No. 61 ¶¶ 6, 107, 148. Danaher "opened a criminal case to investigate Couloute's complaint" relying "solely on Couloute's narrative." *Id.* ¶¶ 148-49. S.C. asserts that when Danaher opened his investigation into Haidon in January 2017, BPD knew: (1) that Couloute's "access to S.C. [was] suspended," *id.* ¶ 6; (2) that S.C. had credibly alleged Couloute sexually

and physically abused her, *id.* ¶ 7; and (3) that Couloute had a documented history of "extreme instability, domestic violence, and manipulation," *id.* ¶ 149.

After a "cursory" investigation, Danaher "drafted an arrest[ ]warrant affidavit" for Haidon "riddled with known material falsehoods and critical omissions."[2]  *Id.* ¶ 150.  On January 24, 2017, a Connecticut Superior Court judge signed an arrest warrant for Haidon based on Danaher's affidavit.  *Id.* ¶¶ 158, 261.  The warrant required Haidon to "comply with all civil and/or family court orders regarding custody and visitation" as a condition of her release.  *Id.* ¶ 158 (internal quotation marks omitted).  Further, S.C. alleges Danaher "unilaterally altered" the official extradition request by adding handwritten "extra-judicial conditions" that were "designed to subvert the New York protective order and to coerce the transfer of S.C. to [Couloute] upon [Haidon's] arrest."  *Id.* ¶¶ 9-10, 152, 161.  *See also id.* ¶ 159 (alleging Danaher handwrote "[d]o not release unless nonfinancial conditions are met," on the extradition authorization request).

Haidon voluntarily surrendered herself to the BPD on March 6, 2017, was formally arrested, and was charged with felony custodial interference.  *Id.* ¶¶ 166, 185.  S.C. alleges that, due to Haidon's Connecticut arrest warrant and criminal charges, "a New York family court judge returned S.C. to [Couloute's] custody in Georgia" on September 14, 2017.  *Id.* ¶¶ 181, 191-92 (internal quotation marks omitted).  S.C. then lived in Couloute's custody in Georgia from September 2017 to June 2018, during which she "endured verbal, emotional, and physical

---

[2] The following are what S.C. claims were key deficiencies in Danaher's arrest warrant affidavit:  (1) the affidavit falsely asserted that a Connecticut family court granted Couloute's motion for contempt against Haidon; (2) the affidavit "knowingly misrepresented the governing custody orders and falsely asserted" that "S.C.'s temporary residence in Buffalo, New York," was impermissible; (3) the affidavit "omitted crucial facts" supporting Haidon's reasonable belief that "she had the legal right to temporarily locate with S.C. to Buffalo[;]" (4) "[t]he affidavit concealed the [BDP's] November 2016 investigation" that concluded no custodial interference had occurred between Haidon and Couloute; (5) the affidavit "relied solely" on Couloute's word and the BDP did not confer with the West Seneca Police Department; and (6) the affidavit established that Danaher lacked probable cause to arrest Haidon because Haidon's conduct did not "satisfy an element of [the] offense."  Doc. No. 61 ¶ 151.

abuse." *Id.* ¶ 196. *See also id.* ¶¶ 191-206 (detailing the abuse S.C. endured while in Couloute's custody from 2017 to 2018 and the subsequent, lasting harm).

3. *Allegations against the State Defendants and about the Connecticut Fatherhood Initiative Policy*

S.C. connects her 2017 removal from Haidon's custody to Connecticut's Fatherhood Initiative (the "Fatherhood Initiative"), which S.C. characterizes as "a multi-agency program designed to secure millions in federal funding by promoting father involvement, regardless of the cost to children['s] safety." Doc. No. 61 ¶¶ 1-2. S.C. contends the Fatherhood Initiative created "a state-wide policy and custom of unconstitutional gender discrimination" and was "spearheaded" by the State Defendants. *Id.* ¶ 70.

Connecticut established the Fatherhood Initiative in 1999 "to increase paternal involvement as an affirmative governmental objective integrated into programming, procurement, training, and performance metrics." *Id.* ¶ 49. S.C. asserts the State Defendants formalized and expanded the Fatherhood Initiative through the 2010 Multi-Agency Memorandum of Understanding ("2010 MOU"). [3] *Id.* ¶ 50. The 2010 MOU bound the Connecticut judiciary and "sister agencies" to: "(a) seek opportunities for funding to support positive father involvement; (b) track statistics and trends . . . related to the grant activities; (c) designate liaisons; and (d) provide membership and active participation in fatherhood governance." *Id.* ¶ 50 (internal quotation marks omitted).

S.C. asserts that the Fatherhood Initiative and the 2010 MOU are discriminatory because they highlight the harms of separating children from their fathers "without parallel recognition of mothers' or children's interests" and contain "no equivalent expression of concern for mothers."

---

[3] Defendant Commissioners Roderick Bremby and Joette Katz led DSS and DCF, respectively, at the time of the 2010 MOU's signing. Doc. No. 61 ¶ 72.

*Id.* ¶¶ 50,72.  Further, S.C. alleges that the Fatherhood Initiative results in DSS and DCF, among other state entities, "systemically favor[ing] fathers over mothers in custody-related matters."[4] *Id.* ¶ 48.  S.C. contends that DCF and DSS "adopted parallel casework expectations" that encouraged "engag[ing] fathers, balanc[ing] enforcement statistics, and avoid[ing] mother-only safety plans," leading to "custody changes against protective mothers."[5]  *Id.* ¶ 56 (internal quotation marks omitted).

S.C. argues that DCF applied the Fatherhood Initiative's "discriminatory system" to her case.  *Id.* ¶ 75.  Allegedly, DCF Manager Aisha Gage ("Gage") directed DCF Representative Deshawn Hawkins ("Hawkins") not to contact Haidon "during an active investigation."  *Id.* ¶¶ 40-41, 75, 130-32.  However, DCF Program Manager Ayesha Gaines ("Gaines") later stated that no one directed Hawkins to "not discuss the pending investigation" with Haidon.  *Id.* ¶¶ 75, 130.  S.C. argues that Gage, Hawkins, and Gaines's statements demonstrate either a deliberate cover-up, direct misrepresentation, or gross negligence.  *Id.* ¶¶ 75, 134.  Further, she refers to DCF's investigation as "biased" against Haidon and a "sham" because they "conceal[ed] exculpatory evidence, which directly facilitated" S.C. and Haidon's 2017 separation.  *Id.* ¶¶ 212, 235, 252, 273, 293, 360.

### 4.  *S.C.'s claims against the Bloomfield and State Defendants*

S.C.'s amended complaint contains thirteen counts.  *See generally* Doc. No. 61.  She alleges the following counts against all individual Bloomfield and State Defendants:  count one,

---

[4] S.C. also points to the Connecticut General Assembly passing Substitute Senate Bill No. 289 in 2022 as Connecticut's "reaffirm[ing] and expand[ing] the Fatherhood Initiative" by "creating a permanent office for it within DSS and an oversight council."  Doc. No. 61 ¶ 73.  She states that defendants DSS Commissioner Andrea Reeves and DCF Commissioner Jodi Hill-Lilly "are responsible for the continuing implementation of this system."  *Id.*

[5] S.C. names several other protective mothers who allegedly experienced discrimination due to the Fatherhood Initiative.  *See, e.g.,* Doc. No. 61 ¶ 57, 74, 317, 329-30.  None of those mothers is listed as a named plaintiff, nor does S.C. appear to be seeking to represent a class of plaintiffs.  *See generally* Doc. No. 61.  Therefore, I do not address S.C.'s factual allegations related to those mothers.

violation of S.C.'s First and Fourteenth Amendment rights to familial association and expressive conduct under section 1983; count two, violation of S.C.'s Fourteenth Amendment procedural and substantive due process rights under section 1983; count three, violation of S.C.'s Fourth Amendment right against unreasonable seizure for child removal under section 1983; count four, violation of S.C.'s First, Fourth, and Fourteenth Amendment rights for failing to intervene under section 1983; count five, violation of S.C.'s First, Fourth, and Fourteenth Amendment rights due to civil conspiracy under section 1983; count seven, violation of S.C.'s Fourteenth Amendment equal protection rights under section 1983; count eight, aiding and abetting sexual abuse under Connecticut state law; count nine, intentional infliction of emotional distress (IIED) under Connecticut state law; and count ten, civil conspiracy under Connecticut state law.  Doc. No. 61 at 71-120.

In count six, S.C. asserts one claim of *Monell* liability under section 1983 against the Town of Bloomfield, DSS, and DCF.  *Id.* at 98-112.  Count twelve alleges negligent supervision and training under Connecticut state law against the Town of Bloomfield, DSS, DCF, and all supervisory individual defendants:  "Hammick, Klomberg, Suplee, Reeves, Bremby, Hill-Lilly, Katz, Gaines, and Gage."  *Id.* at 122-24.

Finally, S.C. asserts two claims against all the Defendants:  count eleven, negligence and reckless disregard under Connecticut state law; and count thirteen, negligent infliction of emotional distress ("NIED") under Connecticut state law.  *Id.* at 121-22, 124-26.

B. Procedural History

Prior to the instant case, Haidon filed a lawsuit against Danaher in federal court, *Haidon v. Danaher*, Dkt. No. 3:19-cv-119 ("*Haidon*" or the "*Haidon* case").[6]  The case was tried to a jury and resulted in a verdict awarding Haidon $1,500,000 in compensatory damages.  *Haidon*, Doc. No. 220.[7]  The jury found that Danaher, "while acting under color of law, maliciously prosecuted Ms. Haidon in violation of her Fourth Amendment Constitutional rights" and "falsely arrested Ms. Haidon in violation of Connecticut state law[.]"  *Id.* at 1.  I denied Danaher's motion for judgment as a matter of law.  *Haidon*, Doc. No. 278.  *See also Haidon*, Doc. No. 286 (denying Danaher's motion for reconsideration regarding my ruling on Danaher's motion for judgment as a matter of law).[8]

On March 21, 2025, S.C. commenced this action against Danaher in federal court.  Doc. No. 1.  On September 2, 2025, S.C. filed an amended complaint naming additional Bloomfield and State Defendants.  Doc. No. 28.  The Bloomfield and State Defendants filed motions to dismiss on January 9, 2026.  Doc. Nos. 45 and 47.  S.C. filed an opposition to both motions to dismiss on February 20, 2026.[9]  Doc. No. 53-5.  At the court's request, S.C. filed a second amended complaint removing a reference to sensitive information on May 5, 2026.  Doc. No. 61.

---

[6] Haidon brought the following claims against Danaher:  (1) malicious prosecution in violation of the Fourth and Fourteenth Amendments under section 1983; (2) false arrest in violation of the Fourth and Fourteenth Amendments under section 1983; (3) violation of the First and Fourteenth Amendment due process right to care and custody of child and right to intimate association under section 1983; (4) abuse of process in violation of Connecticut state law; (5) false arrest in violation of Connecticut state law; and (6) malicious prosecution in violation of Connecticut law. *See generally Haidon*, Doc. No. 45.

[7] Haidon's ultimate judgment against Danaher was $1,627,500.00.  *Haidon*, Doc. No. 301.

[8] Danaher initially appealed the *Haidon* case judgment to the Second Circuit; the parties filed a stipulation to withdraw the appeal, effective November 14, 2025.  *Haidon*, Doc. Nos. 303, 311.

[9] S.C. also moved for permission to alternatively serve State Defendant Roderick Bremby.  Doc. No. 53-5 at 51-53.  I granted that motion on February 24, 2026.  Doc. No. 55.

**III.    Discussion**

The State Defendants and the Bloomfield Defendants filed separate motions to dismiss. Doc. Nos. 45 and 47.  The State Defendants argue S.C.'s amended complaint must be dismissed under Rules 12(b)(1), 12(b)(2), and 12(b)(6).  Doc. No. 45.  The Bloomfield Defendants assert S.C.'s amended complaint must be dismissed under Rule 12(b)(6).  Doc. No. 47.

As discussed below, I grant both the State Defendants' and Bloomfield Defendants' motions to dismiss with prejudice under Rule 12(b)(6) because S.C.'s claims are time-barred.

A.  <u>Whether S.C.'s claims against the Defendants are time-barred</u>

Both the State and Bloomfield Defendants argue that S.C.'s claims are time-barred by the applicable statutes of limitations.  Doc. No. 47-1 at 23 (arguing that S.C.'s "claims arise from events that took place approximately nine years ago, well outside the three-year [statute of] limitations period"); Doc. No. 45-1 at 24.  S.C. argues the following "independent legal doctrines" are sufficient to defeat the Defendants' statutes of limitations defense:  "(1) Connecticut's extended statute of repose for sexual abuse claims under Conn. Gen. Stat. § 52-577d; (2) fraudulent concealment tolling under Conn. Gen. Stat. § 52-595 and federal equitable tolling principles; (3) the continuing violation doctrine; and (4) federal equitable tolling based on extraordinary circumstances."  Doc. No. 53-5 at 19.

"Where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss."  *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989) ("Such a motion is properly treated as a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. . . .").  A statute of limitations defense is appropriately raised on a motion to dismiss when "it is clear from the face of the complaint . . . that the plaintiff's claims are barred as a matter of law."

*Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (quoting *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000)).  "[D]ismissal is appropriate only if a complaint clearly shows the claim is out of time."  *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999).

When a cause of action accrues "is a matter of federal rather than state law."  *Santos v. Dist. Council of New York City & Vicinity of United Bhd. of Carpenters & Joiners of Am., AFL-CIO*, 619 F.2d 963, 968 (2d Cir. 1980).  "The general rule in [the Second Circuit] is that a cause of action accrues when 'the plaintiff could first have successfully maintained a suit based on that cause of action.'"  *Ghartey*, 869 F.2d at 163 (quoting *King v. New York Telephone Co.*, 785 F.2d 31, 33 (2d Cir. 1986)); *Santos*, 619 F.2d at 968-69.  *See also Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980) ("[F]ederal law, which governs the date of accrual of federal claims such as those asserted here, . . . establishes as the time of accrual that point in time when the plaintiff knows or has reason to know of the injury which is the basis of his action." (internal citation and quotation marks omitted)).

In cases where a parent asserts a federal claim on behalf of their minor child, the parent's knowledge of the injury to their child determines when a claim accrues.  *M.D. v. Southington Bd. of Educ.*, 334 F.3d 217, 221 (2d Cir. 2003) (holding claims brought under the IDEA accrued when parents knew of the injury to their child on which their claim was based) ("[I]t is clear that plaintiffs 'knew or had reason to know' of their injury when they withdrew M.D. from the Southington school system on January 12, 1994 because they believed that the system was not providing her with an appropriate and adequate education."); *Burns v. Hartford Hosp.*, 192 Conn. 451, 458 n.4 (1984) (holding that statutes of limitations apply to infants based on their parents' knowledge).

11

I consider the Defendants' arguments that S.C.'s claims are time-barred because it is clear from the face of S.C.'s amended complaint when her claims arose and the applicable statutes of limitations. *Staehr*, 547 F.3d at 425. I impute Haidon's knowledge of S.C.'s factual allegations to S.C. for the purpose of determining when S.C.'s claims accrued. *M.D.*, 334 F.3d at 221.

1. *Whether S.C.'s federal claims are barred by the statute of limitations*

S.C.'s first seven counts arise under section 1983. *See generally* Doc. No. 61. In the Second Circuit, "courts apply the statute of limitations for personal injury actions under state law" because "[s]ection 1983 does not provide a specific statute of limitations." *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) (citing *Owens v. Okure*, 488 U.S. 235, 249-51 (1989)). In Connecticut, a section 1983 plaintiff must bring their claim "within three years of the date [her] claim accrues." *Barile v. City of Hartford*, 264 F. App'x 91 (2d Cir. 2008) (citing Conn. Gen. Stat. § 52-577); *Lounsbury v. Jeffries*, 25 F.3d 131, 133-34 (2d Cir. 1994) (applying the three-year statute in 52-577 to plaintiff's section 1983 claims).

S.C. does not dispute the Defendants' assertion that the three-year statute of limitations period for personal injury or tort actions pursuant to Conn. Gen. Stat. § 52-577 applies to her section 1983 claims.[10] Doc. No. 53-5 at 18-19; Doc. No. 45-1 at 24; Doc. No. 47-1 at 23-24. Applying a generous interpretation of the three-year statute of limitations to S.C.'s allegations, the latest date by which her section 1983 claims could have accrued was in June 2018, when Haidon regained custody of S.C. *See* Doc. No. 61 ¶ 46. S.C. filed her amended complaint on September 2, 2025, over seven years after her cause of action accrued. *See* Doc. No. 28.

---

[10] Conn. Gen. Stat. § 52-577 states: "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

12

It is clear from the face of S.C.'s amended complaint that her section 1983 claims are time barred under section 52-577.  Even so, S.C. contends that her federal claims are timely under:  (1) "fraudulent concealment tolling under Conn. Gen. Stat. § 52-595 and federal equitable tolling principles;" (2) "the continuing violation doctrine;" and (3) "federal equitable tolling based on extraordinary circumstances."  Doc. No. 53-5 at 19-26.

> a.  Whether fraudulent concealment tolling under Conn. Gen. Stat. § 52-595 and federal equitable tolling principles apply to S.C.'s federal claims

S.C. claims that "[u]nder 42 U.S.C. § 1988(a),[11] Connecticut's fraudulent concealment statute, Conn. Gen. Stat. § 52-595, applies to S.C.'s federal claims."  Doc. No. 53-5 at 21.

"Statutes of limitations are generally subject to equitable tolling where necessary to prevent unfairness to a plaintiff who is not at fault for her lateness in filing."  *Gonzalez v. Hasty*, 651 F.3d 318, 322 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Veltri v. Bldg. Serv. 32B–J Pension Fund*, 393 F.3d 318, 322 (2d Cir. 2004)).  In the Second Circuit, "equitable tolling" includes "fraudulent concealment of a cause of action that has 'in some sense accrued earlier,'" and "fraudulent concealment that postpones the accrual of a cause of action."  *Pearl v. City of Long Beach*, 296 F.3d 76, 82 (2d Cir. 2002) (quoting *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1156 (2d Cir. 1995)).  "Where [the] defendant is responsible for concealing the existence

---

[11] 42 U.S.C. § 1988(a) reads:

> The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.

of [the] plaintiff's cause of action, [the Second Circuit] has held equitable tolling appropriate." *Veltri*, 393 F.3d at 323.

"[I]n section 1983 actions, [courts] borrow not only a state's limitations period but also its tolling rules, unless applying the state's tolling rules would defeat the goals of the federal statute at issue[.]" *Pearl*, 296 F.3d at 80 (citation modified).  Section 1983's "chief goals [are] compensation and deterrence" and "its subsidiary goals [are] uniformity and federalism." *Hardin v. Straub*, 490 U.S. 536, 539 (1989)

Section 52-595 states that:  "If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence."  Conn. Gen. Stat. § 52-595.

To establish fraudulent concealment, a plaintiff must show the defendant:  "(1) had actual awareness, rather than imputed knowledge, of the facts necessary to establish the [plaintiff's] cause of action; (2) intentionally concealed these facts from the [plaintiff]; and (3) concealed the facts for the purpose of obtaining delay on the [plaintiff's] part in filing a complaint on their cause of action." *Iacurci v. Sax*, 313 Conn. 786, 799-800 (2014) (internal quotation marks omitted) (alterations in original) (quoting *Falls Church Group, Ltd. v. Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 105 (2007)).  S.C. must plausibly allege both that she was "ignorant of the facts that the defendant has sought to conceal" and that the Defendants were "aware of the fact[s], intentionally concealed [them], and did so to delay the filing of [her] claim." *Pritsker v. Am. Gen. Life Ins. Co.*, 690 F. App'x 770, 772 (2d Cir. 2017) (internal quotation marks omitted) (first quoting *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 427 (2d Cir. 1999)).

14

S.C. points to particular facts that the Defendants allegedly concealed and that "were not available to S.C. or [Haidon] until they were uncovered through litigation."  Doc. No. 53-5 at 23. Those facts are:  (1) "Detective Laiuppa's forensic interview notes" documenting S.C.'s sexual abuse disclosure; (2) the internal BPD investigations;[12] (3) the DCF records contradicting the abuse diagnosis; and (4) Danaher's misrepresentations in Haidon's arrest warrant affidavit.  *Id*. S.C. argues that "the full scope of Defendants' misconduct did not emerge until the *Haidon* trial in December 2023 and this Court's post-trial rulings in August 2024."  *Id*.  Specifically, S.C. claims that the December 2023 trial and August 2024 post-trial rulings that "Officer Danaher fabricated probable cause" were "discover[ies]" informing S.C. of her "ability to pursue her own claims."  Doc. No. 53-5 at 27-28.

Further, S.C. contends that her amended complaint "alleges intentional concealment," by stating that:  (1) Detective Laiuppa's forensic interview notes "were never revealed to [Haidon] or the courts making custody decisions[;]" (2) "Suplee's November 2016 investigation was suppressed" when Danaher sought the 2017 arrest warrant; and (3) the hospital's diagnosis of S.C. with abuse "was internally contradicted in DCF records, which falsely asserted that the examiner had determined S.C. was not abused."  Doc. No. 53-5 at 22.  *See* Doc. No. 61 ¶¶ 117(c) (describing the hospital's finding of abuse and plan to advise DCF), 126 (describing Detective Laiuppa's 2015 forensic interview of S.C. regarding her sexual abuse disclosures), 151(d) (describing Suplee's 2016 custodial interference investigation).

---

[12] I assume that the "internal BPD investigations" S.C. refers to are the "2013 firearms warning about [Couloute]," Detective Laiuppa's 2015 forensic interview with S.C., a "2015 BPD determination that S.C. should remain in [Haidon's]" custody, and "Suplee's November 2016 investigation finding . . . no custodial interference."  Doc. No. 53-5 at 21-22.  None of those "internal BPD investigations" were unknown or actively concealed from S.C. or Haidon by the Defendants.  *See* Doc. No. 61 ¶ 109 (referencing Couloute's arrest for assault and confiscation of his firearm which was "quite public"); *id.* ¶¶ 85-88; 126-29 (describing S.C.'s forensic interview with Detective Laiuppa and BPD's conclusion that S.C. reside solely with Haidon); *id.* ¶¶ 16, 102, 129 (noting Suplee's custodial interference investigation and findings).

The Bloomfield Defendants respond that S.C.'s amended complaint does not trigger section 52-595 because it "lacks any allegation that Defendants knew of, and intentionally concealed, the facts necessary to support S.C.'s claims for the purpose of causing delay." Doc. No. 47-1 at 31; Doc. No. 58 at 13. They argue that those allegations "suggest only that certain Bloomfield Defendants failed to disclose material information to 'decisionmakers' involved in determining whether to arrest Haidon for custodial interference." Doc. No. 58 at 14. The Bloomfield Defendants also assert that the amended complaint contains no allegations "that material information was affirmatively concealed from S.C. or Haidon" or that "it was concealed for the purpose of delaying a potential lawsuit." *Id*. (emphasis omitted).

The State Defendants also argue S.C.'s amended complaint "does not contain allegations of concealment." Doc. No. 57 at 3. Further, the State Defendants assert that "Haidon was well aware of the alleged deficiencies" of DCF's 2015 investigation. *Id.* Notably, S.C.'s amended complaint contains allegations that "Haidon was so dissatisfied with DCF's investigation" that she requested her attorney write a letter documenting her complaints, including her allegation "that the DCF investigator was instructed not to contact [Haidon]" in 2015. *Id. See* Doc. No. 61 ¶ 135 (describing Haidon's attorney's formal complaint filed with a DCF supervisor in October 2015).

S.C. fails to allege any specific facts that were concealed from her that were necessary to "establish [her] cause of action." *Iacurci*, 313 Conn. at 799-800. The documents that S.C. alleges demonstrate "that Defendants knew of the abuse and the absence of probable cause for the [arrest] warrant" were not concealed from Haidon. Doc. No. 53-5 at 21-22 (describing the following documents: Detective Laiuppa's 2015 forensic interview of S.C. and her notes from the interview, BPD records from 2013, 2014, and 2015 involving reports by S.C. and Haidon

16

about Couloute; and Suplee's 2016 investigation finding no custodial interference); Doc. No. 61 ¶¶ 82, 84-88, 109, 117, 151(d), 217, 278.  Rather, those documents contain information first provided or otherwise known by S.C. and Haidon.

S.C.'s amended complaint does not allege that Detective Laiuppa's forensic interview notes contained facts not known to, or intentionally concealed from, S.C. or Haidon.  *See* Doc. No. 61 ¶¶ 7, 16, 32, 45, 126, 127, 129, 147, 151(d), 157, 219, 235(c), 242, 253, 259, 260(d), 274, 280, 282, 293(e), 305-306, 366(c), 373(e), 381(e) (describing Detective Laiuppa's failure to disclose the 2015 forensic interview sexual abuse allegations when Danaher sought Haidon's 2017 arrest warrant).  The existence of Detective Laiuppa's 2015 forensic interview notes and Detective Laiuppa's failure to disclose those interview notes when Danaher sought the 2017 arrest warrant does not support fraudulent concealment tolling.  Even if the Bloomfield Defendants attempted to conceal "the true nature of their misconduct," S.C.'s amended complaint does not allege how they concealed from S.C. or Haidon facts about the 2015 forensic interview for the purpose of preventing S.C.'s lawsuit.  Doc. No. 53-5 at 22.

Similar analysis applies to Suplee's and DCF's purported concealment.  S.C. alleges that Suplee "endorsed and stood by while Danaher's warrant package was delivered to the warrant judge" despite concluding in his November 2016 investigation that there was no custodial interference between Haidon and Couloute.  Doc. No. 61 ¶¶ 31, 102, 155.  Although S.C. characterizes this as Suplee "suppress[ing]" his November 2016 investigation findings, S.C. does not allege that the Bloomfield Defendants fraudulently concealed those findings from Haidon or that Haidon was unaware of the findings.  Doc. No. 53-5 at 22; Doc. No. 61 at ¶¶ 31, 102, 129, 155; *id.* ¶ 147 (referring to the failure to disclose the November 2016 investigation findings as a

17

"systemic failure" and "a complete breakdown in departmental communication and supervision").

Finally, S.C. alleges the internal contradictions in DCF records "falsely assert[ing] that the [hospital] examiner . . . determined S.C. was not abused" amount to "intentional concealment." Doc. No. 53-5 at 22. S.C. was examined at the hospital in June 2014, at which time the hospital diagnosed her with "abuse." Doc. No. 61 ¶¶ 82, 117. However, she alleges that "DCF's internal records contradictorily assert that the hospital examiner determined she was not abused," which she calls "an intentional or reckless falsehood that served to erase medical evidence and protect [Couloute]." *Id.* ¶ 118 (internal emphasis omitted). Nonetheless, S.C.'s amended complaint does not allege that the DCF Defendants had actual awareness of facts required to establish any of S.C.'s causes of action, that they intentionally concealed those facts from S.C. or Haidon, or that they concealed those facts to delay S.C. in filing her complaint. *See Iacurci*, 313 Conn. at 799-800. S.C. alleges that the internal DCF records hindered future action by the State Defendants and BPD to protect S.C. from Couloute, not that the contradictory records hindered S.C.'s ability to bring her claims. Doc No. 61 ¶¶ 118, 236. *But see* Doc. No. 61 ¶ 82 ("[T]he hospital . . . referred the matter to DCF and the SCAN (Suspected Child Abuse and Neglect) team creating a formal medical record, accessible to all law enforcement, that S.C. was a confirmed victim of abuse.").

Although S.C. gestures to the "full scope of Defendants' misconduct" emerging during the December 2023 trial of the *Haidon* case and August 2024 post-trial rulings, S.C. does not indicate specific facts that were revealed during those proceedings and established the causes of action at issue in her current lawsuit. *See* Doc. No. 53-5 at 23. When the 2019 *Haidon* case was filed, S.C. and Haidon were fully aware of the facts that they claim demonstrate Defendants'

18

knowledge of Couloute's abuse and the lack of probable cause for Haidon's 2017 arrest.  Doc. No. 53-5 at 21-22.  In fact, Danaher's misrepresentations in Haidon's arrest warrant affidavit were a part of Haidon's 2019 complaint.  *See Haidon*, Doc. No. 45 ¶¶ 28, 30, 35 (referring to the alleged inaccuracies, omissions, and false statements in Danaher's "fraudulent application for [Haidon's] arrest warrant").

The jury's verdict in the *Haidon* case sustained Haidon's allegation that Danaher fabricated probable cause as a part of its finding that Danaher maliciously prosecuted Haidon. *Haidon*, Doc. No. 220 at 1 (finding Danaher maliciously prosecuted Haidon in violation of her Fourth Amendment Constitutional rights and Connecticut state law); *McHale v. W.B.S. Corp.*, 187 Conn. 444, 447 (1982) (including as an element of malicious prosecution that "the defendant acted without probable cause").  It is unclear how the *Haidon* case jury verdict "was itself a discovery that informed S.C.'s ability to pursue her own claims" when S.C. brings claims almost entirely unrelated to the *Haidon* case verdict.  Doc. No. 53-5 at 27-28.  *See generally Haidon*, Doc. Nos. 220, 222.

Moreover, the August 2024 post-trial rulings served only to uphold the jury's verdict and address Danaher's arguments regarding his "motion for judgment as a matter of law, for a new trial, or for remittitur."  *Haidon*, Doc. No. 278 at 1; *id.* 8-29 (addressing whether evidence supported the jury's verdict and whether Danaher was entitled to qualified immunity); *id.* at 29-36 (analyzing whether there were errors in the jury instructions, errors in evidentiary rulings, and jury prejudice resulting from attorney misconduct); *id.* at 37-41 (discussing Danaher's request for a conditional remittitur).  Those rulings did not contain additional information about S.C.'s claims that the Defendants previously concealed to delay S.C. from filing the instant case.  *Id.*

19

S.C.'s amended complaint neither plausibly alleges facts of which she was ignorant and that the Defendants sought to conceal, nor alleges that the Defendants intentionally concealed facts to delay her filing a claim.  *See Iacurci*, 313 Conn. at 799-800.  Therefore, fraudulent concealment tolling under Conn. Gen. Stat. § 52-595 does not apply to S.C.'s federal claims against the Defendants.

> b.  Whether the continuing violation doctrine tolls the statutes of limitations for S.C.'s federal claims

S.C. cites the continuing violation doctrine to argue that her federal claims accrued "when she was returned to her mother's custody" in June 2018.  Doc. No. 53-5 at 25.  The Defendants assert that the continuing violation doctrine does not apply to S.C.'s case.  Doc. No. 45-1 at 27; Doc. No. 47-1 at 32; Doc. No. 57 at 4; Doc. No. 58 at 16-18.  The State Defendants argue that S.C. alleges neither "an ongoing relationship between [S.C.] and DCF that would have been affected by the Fatherhood Initiative" nor post-2017 DCF involvement with S.C.  Doc. No. 57 at 4.  The Bloomfield Defendants contend that S.C. does not "identify any continuing course of conduct within the limitations period," and that even if the continuing violation doctrine applied, her claims would still be untimely.  Doc. No. 58 at 17 (emphasis omitted).

"The continuing violation doctrine is an 'exception to the normal knew-or-should-have-known accrual date.'"  *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009) (quoting *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999)).  *See also Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994) ("Where a continuing violation can be shown, the plaintiff is entitled to bring suit challenging all conduct that was a part of that violation, even conduct that occurred outside the limitations period.").  "To assert a continuing violation for statute of limitations purposes, the plaintiff must 'allege both the existence of an ongoing policy of [a section 1983 violation] and some non-time-barred acts taken in the furtherance of that policy.'"

20

*Shomo*, 579 F.3d at 182 (quoting *Harris*, 186 F.3d at 250).  "[A] continuing violation cannot be established merely because the claimant continues to feel the effects of a time-barred discriminatory act."  *Harris*, 186 F.3d at 250.

For the continuing violation doctrine to apply, S.C. must allege "some non-time-barred acts taken in furtherance of [the unconstitutional] policy."  *Shomo*, 579 F.3d at 182; *Harris*, 186 F.3d at 250.  However, S.C. does not allege acts or omissions by any defendant within three years of the date she filed her amended complaint in the instant case, September 2, 2025, much less her initial complaint.  Doc. Nos. 1, 28.  Moreover, S.C. admits that her claims accrued in June 2018, when she was returned to Haidon's custody.  Doc. No. 53-5 at 25.  Assuming the Defendants' actions were part of a "single, continuous deprivation of S.C.'s rights," none of those actions were taken after June 2018.  *Id.*  Thus, S.C. does not allege that any actions taken by the Defendants within three years of her filing the amended complaint drew in conduct that occurred beyond the statute of limitations.

Therefore, the continuing violation doctrine does not toll the statute of limitations on S.C.'s section 1983 claims.

       c.  Whether federal equitable tolling based on extraordinary circumstances applies to S.C.'s federal claims

S.C. next argues that her young age "when she was seized from [Haidon] and placed with [Couloute]," Haidon's custody fight, and affirmative misconduct by officials are "extraordinary circumstance[s] justifying equitable tolling."  Doc. No. 53-5 at 25-26.  The State Defendants contend that Haidon's involvement in the DCF investigation and pursuit of her own claims in 2019 demonstrate the lack of extraordinary circumstances.  Doc. No. 57 at 4-5.  The Bloomfield Defendants also note that none of S.C.'s cited reasons prevented Haidon "from filing her own

21

complaint in 2019," nor do those reasons explain why Haidon did not file suit after S.C. was returned to her custody in 2018. Doc. No. 58 at 19.

A plaintiff may "avoid the bar of the statute of limitations" through equitable tolling. *Valdez ex rel. Donely v. United States*, 518 F.3d 173, 182 (2d Cir. 2008). "Equitable tolling is an extraordinary measure that applies only when [a] plaintiff is prevented from filing despite exercising [the] level of diligence which could reasonably be expected in the circumstances." *Veltri v. Bldg. Serv. 32B–J Pension Fund*, 393 F.3d 318, 322 (2d Cir. 2004). For example, courts find equitable tolling appropriate "where plaintiff filed and served defective papers before the expiration of the statutory period, or where defendant induced plaintiff to file late through trickery or deception[.]" *Id*. at 322-23 (citation modified).

"[A] litigant is entitled to equitable tolling of a statute of limitations only if the litigant establishes two elements: '(1) that [s]he has been pursuing [her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way and prevented timely filing.'" *Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 255 (2016) (quoting *Holland v. Florida,* 560 U.S. 631, 649 (2010)). *See also Valdez ex rel. Donely*, 518 F.3d at 182 (describing the availability of equitable tolling when a plaintiff exercises "all due diligence" but "is unable to obtain vital information bearing on the existence of his claim").

S.C. cites *Valdez* to support her argument that her case warrants equitable tolling because "affirmative misconduct by officials can constitute an extraordinary circumstance." Doc. No. 53-5 at 26. Although there was no fraudulent concealment in *Valdez,* special circumstances arose "from the defendant's failure to disclose that physicians" providing services "in private voluntary hospitals" are "*de jure* federal employees." *Valdez ex rel. Donely*, 518 F.3d at 183. The Second Circuit concluded that the absence of a regulation requiring notice to a patient that

22

their doctor is a federal government employee resulted in a "potential statute of limitations trap in states . . . provid[ing] a longer period of time than the FTCA to file a complaint." *Id.* The Second Circuit did not characterize the federal government's actions as affirmative misconduct, but instead noted that it was "problematic" that the federal government took advantage of that "trap" in a "number of cases." *Id. See also Veltri*, 393 F.3d at 324 (holding that "failure to comply with the regulatory obligation to disclose the existence of a cause of action to the plan participant whose benefits have been denied is the type of concealment that entitles plaintiff to equitable tolling of the statute of limitations.").

S.C. claims that the Defendants' "fabrication and concealment" prevented her "from discovering her claims" and "impeded any effort to pursue them." Doc. No. 53-5 at 26. However, S.C. cites no specific facts detailing the "fabrication and concealment" to which she refers or how Defendants prevented her from discovering and pursuing her claims. *Id.* The only fabrication referenced in her discussion of equitable tolling is the "fabricated warrant." *Id.* at 25-26. That "fabricated warrant" was not concealed from Haidon and did not deter Haidon from pursing claims related to the warrant within the statute of limitations. *Id. See generally Haidon*, Doc. No. 45. Despite asserting that various officials committed affirmative misconduct, S.C. does not describe how that misconduct prevented her from timely pursuing her claims. Doc. No. 53-5 at 25-26.

Additionally, S.C. argues that Connecticut's statute of limitations is inconsistent with section 1983's remedial objectives because "Connecticut stands virtually alone in refusing to toll limitations for minors." Doc. No. 53-5 at 26. In so arguing, S.C. requests that I reject Connecticut Supreme Court precedent holding that there is no blanket exception allowing courts to toll statutes of limitations for minors. *See Lametta v. Connecticut Light & Power Co.*, 139

23

Conn. 218, 221-23 (Conn. 1952) (declining to adopt an exception allowing a plaintiff's minority to toll the statute of limitations); *Tulin v. Tulin*, 124 Conn. 518, 522 (Conn. 1938) *("*Under our practice an action on behalf of a minor is properly brought by the minor by next friend."). Federalism and judicial abstention prevent me from considering and overturning established Connecticut state law.  *See, e.g., Rooker v. Fid. Tr. Co.*, 263 U.S. 413, 415-16 (1923) ("Under the legislation of Congress, no court of the United States other than [the Supreme Court] could entertain a proceeding to reverse or modify the [state court] judgment . . . ."); *Hachamovitch v. DeBuono*, 159 F.3d 687, 693 (2d Cir. 1998) ("The *Rooker-Feldman* doctrine provides that the lower federal courts lack subject matter jurisdiction over a case if the exercise of jurisdiction over that case would result in the reversal or modification of a state court judgment.").

In certain circumstances, however, Connecticut courts allow equitable tolling due to a minor's failure to meet the statute of limitations where the interests of the minor and the guardian appear to be adverse.  *See Caron v. Adams*, 33 Conn. App. 673, 683 (1994) ("In this case, the interests of the guardian and ward appear to have been adverse.  We decline to establish a blanket holding that a child has no recourse where no next friend has stepped forward in a timely fashion to protect the child's interests.").  S.C. and Haidon's interests are not and never were adverse.  Therefore, S.C.'s minority is not a reason to apply equitable tolling to the statute of limitations for S.C.'s federal law claims.

S.C. fails to demonstrate "that some extraordinary circumstance stood in [her] way" and prevented her from timely filing her claims or joining Haidon's suit.  *Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 255 (2016) (quoting *Holland v. Florida,* 560 U.S. 631, 649 (2010)).  Further, applying Connecticut's three-year statute of limitations to S.C.'s claims does not undermine the goals of section 1983.  *See Hardin v. Straub*, 490 U.S. 536, 538-40

24

(1989) (noting section 1983's goals of compensation, deterrence, uniformity, and federalism). Therefore, federal equitable tolling principles do not justify tolling the statute of limitations in S.C.'s federal claims against the Defendants.

2. *Whether S.C.'s state law claims are barred by statutes of limitations*

The Defendants contend that S.C.'s state law claims, counts eight through thirteen, are barred by Conn. Gen. Stat. §§ 52-577 and 52-584.  Doc. No. 47-1 at 26; Doc. No. 57 at 1-2.  S.C. argues that the extended statute of repose in Conn. Gen. Stat. § 52-577d, fraudulent concealment tolling, and the continuing violation doctrine render her state law claims timely.  Doc. No. 53-5 at 19-25.

Section 52-577 provides a three-year statute of limitations for intentional tort claims. Conn. Gen. Stat. § 52-577; *Doe #2 v. Rackliffe*, 337 Conn. 627, 634 (2020) ("[T]he general rule in Connecticut is that intentional torts, unless subject to a specialized statute of limitations, are governed by the three year statute of limitations in § 52-577 . . . ."); *Doe v. Boy Scouts of Am. Corp.*, 323 Conn. 303, 332-33 (2016).  Section 52-584 states that:

> No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, or by malpractice of a physician, surgeon, dentist, podiatrist, chiropractor, advanced practice registered nurse, hospital or sanatorium, shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of, except that a counterclaim may be interposed in any such action any time before the pleadings in such action are finally closed.

Conn. Gen. Stat. § 52-584.  Section 52-584 "governs negligence claims in particular." *Doe #2*, 337 Conn. at 633 (2020).  "The three[-]year limitation period in [section] 52-577 applies to all tort actions except (1) negligence claims, which are governed by [section] 52-584, and (2) tort claims governed by a specialized statute of limitations." *Doe #2*, 337 Conn. at 633-34.

25

In S.C.'s amended complaint, count eight alleges aiding and abetting sexual abuse, count nine alleges intentional infliction of emotional distress ("IIED"), and count ten alleges civil conspiracy. Doc. No. 61 at 115-120. Section 52-577's three-year statute of limitations applies to counts eight through ten because those claims are based on intentional torts. *Doe #2*, 337 Conn. at 633-34; *LaBow v. Rubin*, 95 Conn. App. 454, 469-70 (2006) (applying the three-year statute of limitations in section 52-577 to IIED and civil conspiracy claims) ("[I]ntentional infliction of emotional distress and civil conspiracy, respectively, are unquestionably tort actions."). Therefore, counts eight, nine, and ten are time-barred under section 52-577 because all the events alleged in S.C.'s amended complaint happened in 2018 or earlier, more than three years before S.C. filed suit in 2025.

S.C.'s amended complaint also alleges the following claims against the Defendants: count eleven, negligence and reckless disregard; count twelve, negligent supervision and training; and count thirteen, negligent infliction of emotional distress ("NIED"). Doc. No. 61 at 121-126. Section 52-584's two-year statute of limitations and three-year statute of repose applies to counts eleven through thirteen because they are based in negligence. *Doe #2*, 337 Conn. at 633-34; *Rosato v. Mascardo*, 82 Conn. App. 396, 402 (2004) ("The three year period specifies the time beyond which an action under [section] 52-584 is absolutely barred, and the three year period is, therefore, a statute of repose."); *Williams v. Cmty. Sols., Inc.*, 2011 WL 4576151, at *4 (D. Conn. Sept. 30, 2011) (applying section 52-584's statute of limitations to NIED and negligent supervision claims). All of S.C.'s injuries and any actions or omissions allegedly committed by the Defendants occurred in June 2018 or earlier and, therefore, are also time barred under section 52-584. Conn. Gen. Stat. § 52-584.

26

      a.   Whether Connecticut's extended statute of repose for sexual abuse claims applies to S.C.'s state law claims

S.C. argues that section 52-577d applies to her state law claims because her amended complaint "alleges that Defendants knowingly placed S.C. with her documented sexual abuser, exacerbating the trauma of prior abuse and subjecting her to continued harm."[13]  Doc. No. 53-5 at 2, 20.  The Bloomfield Defendants concede that "[t]he only count that may not be governed by [section] 52-577 or [section] 52-584" is S.C.'s eighth count, aiding and abetting sexual abuse under Connecticut state law.  *See* Doc. No. 47-1 at 26.  The State Defendants assert that section 52-577d is inapplicable because S.C. "makes no allegations tying" the State Defendants "to any alleged sexual abuse, sexual exploitation or sexual assault."[14]  Doc. No. 45-1 at 28.

Section 52-577d provides an exception to the three-year statute of limitations generally applicable to intentional tort claims by mandating that:  "[N]o action to recover damages for personal injury to a person under twenty-one years of age, including emotional distress, caused by sexual abuse, sexual exploitation or sexual assault may be brought by such person later than thirty years from the date such person attains the age of twenty-one."  Conn. Gen. Stat. § 52-577d.

The plain language of section 52-577d applies not just to personal injury claims based on sexual abuse, but to personal injury claims *caused* by sexual abuse.  The Connecticut Supreme Court has held that section 52-577d "is not concerned with *particular types of defendants*, but with providing a recovery for a *particular type of injury*."  *Doe v. Boy Scouts of Am. Corp.*, 323

---

[13] S.C. does not argue that section 52-577d applies to her section 1983 claims, and Defendants cite authority holding that section 52-577d's "limitation period cannot be borrowed in [section] 1983" cases. *Torrez v. Dep't of Child. & Fams.*, 2023 WL 4236039, at *3 (D. Conn. June 28, 2023).  *See* Doc. No. 45-1 at 28; Doc. No. 47-1 at 27 n.7; Doc. No. 53-5 at 19.

[14] My ruling on this issue is based solely on statutes of limitation grounds.  However, I note that S.C. does not allege any direct acts or omissions by the State Defendants resulting in her 2017 placement with Couloute.  *See* Doc. No. 61 ¶ 367 (referencing the Fatherhood Initiative and the 2015 DCF investigation).

Conn. at 334 (emphasis in original).  Section 52-577d "applies not only to actions against the perpetrators of sexual abuse of minors, but also to actions against parties whose negligent acts or omissions legally caused the personal injuries suffered by the victims of such abuse."  *Id.* at 340. *See also Almonte v. New York Med. Coll.*, 851 F. Supp. 34, 37 (D. Conn. 1994) ("[T]he statute does not expressly limit its application to offenders; rather, reference to the unambiguous language of the statute indicates that the statutory focus is on actions flowing from a particular type of harm, and not parties." (emphasis omitted)).

However, section 52-577d does not reach claims "involving injuries that do not result from intentional sexual misconduct."  *Doe # 2*, 337 Conn. at 636.  Section 52-577d requires "harm caused by an originating act of sexual abuse, exploitation or assault."  *Id.*; *id.* at 643 (stating section 52-577d does not apply to "claims for injuries arising from" negligent conduct "unaccompanied by an originating act of intentional misconduct").

Assuming that section 52-577d applies to each of S.C.'s state law claims, counts eight through thirteen, the question becomes whether those claims were "caused by sexual abuse." Conn. Gen. Stat. § 52-577d.  S.C. explicitly alleges in her amended complaint that in 2014 and 2015 the Defendants were aware of credible evidence that Couloute sexually abused S.C.  *See generally* Doc. No. 61 at 115-116 (describing reports of sexual abuse by Couloute in 2014 and 2015).  In count eight, S.C. alleges that:

> (a) The State Agency Defendants provided substantial assistance by creating and implementing a state-wide policy (the "Fatherhood Initiative") that protected abusive fathers; by conducting a biased and sham DCF investigation that concealed medical evidence of abuse; and by intentionally excluding [Haidon] from the process, thereby removing the primary obstacle to [Couloute's] continued abuse.
>
> (b) The Town of Bloomfield Defendants provided substantial assistance by fabricating a felony criminal case against [Haidon] for the admitted purpose of effecting a change in civil custody; by actively suppressing their own department's vast institutional knowledge of [Couloute's] abuse; and by using the power of a fraudulent warrant to facilitate S.C.'s transfer into [Couloute's] custody.

*Id.* ¶ 367.  Additionally, S.C. alleges in count eight that when Couloute had custody over S.C. in 2017 and 2018, she "was subjected to further abuse, trauma, and neglect, causing the severe and lasting injuries detailed herein."  *Id.* ¶ 368.

Although S.C. repeatedly alleges that Defendants' actions resulted in her placement with a "documented sexual abuser," S.C. does not allege that any sexual abuse happened due to the Defendants' conduct.  *Id.* ¶¶ 363-400.  Her amended complaint does not allege that Couloute sexually abused her during the time she was in his custody from September 2017 to June 2018.  *See generally* Doc. No. 61 ¶ 196 (alleging S.C. "endured verbal, emotional, and physical abuse while living with Couloute" from September 2017 to June 2018).

During oral argument on the Defendants' motions to dismiss, S.C.'s counsel stated for the first time that S.C. alleges she was sexually abused while in Couloute's custody from 2017 to 2018.  I echo the Bloomfield Defendants' counsel in acknowledging that this omission from S.C.'s amended complaint, if genuine, is breathtaking.

At this point, allowing S.C. to replead her complaint to include allegations of sexual abuse during 2017 and 2018 would be unduly prejudicial to the Defendants.  *Foman v. Davis*, 371 U.S. 178, 182 (1962) (listing "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment" as reasons for courts to deny parties leave to amend their pleadings).

S.C. raised no sexual abuse allegations in her original complaint alleging claims against Danaher.  *See generally* Doc. No. 1.  In response to Danaher's motion to dismiss, which argued the statute of limitations for S.C.'s claims had run, S.C. filed an amended complaint that included allegations of sexual abuse by Couloute at a time before any defendant engaged in conduct

giving rise to S.C.'s claims.  Doc. No. 20 at 11-16 (arguing S.C.'s claims were time-barred).

*See, e.g.,* Doc. No. 28 at 115-116 (alleging sexual abuse in 2014 and 2015).  Notably, S.C.'s

amended complaint carefully excluded allegations that Couloute sexually abused S.C. from 2017

to 2018.  *Compare* Doc. No. 28 ¶ 196(b) (stating S.C. "endured verbal, emotional, and physical

abuse while living with Couloute" from September 2017 to June 2018) *with* Doc. No. 1 ¶ 63

(stating S.C. "endured verbal, emotional, and physical abuse while living with Couloute" from

September 2017 to June 2018).

I denied the initial motion to dismiss without prejudice, and all the Defendants raised

timeliness arguments in their motions to dismiss S.C.'s amended complaint.  *See generally* Doc.

Nos. 45, 47, 48.  Significantly, S.C.'s counsel meticulously avoided asserting S.C. was sexually

abused from 2017 to 2018 throughout his opposition brief, with one exception.  *See, e.g.,* Doc.

No. 53-5 at 12 ("From September 2017 to June 2018 . . . S.C. lived in her father's sole custody . .

. .  During this period, S.C. endured verbal, emotional, and physical abuse.  The trauma of her

prior sexual abuse was exacerbated by her placement with the very person who had inflicted that

abuse . . . ."); *id.* at 20 ("Defendants knowingly placed S.C. with her documented sexual abuser,

exacerbating the trauma of prior abuse and subjecting her to continued harm.").  *But see id.* at 46

(citing to facts in S.C.'s amended complaint that do not allege sexual abuse) ("S.C. was seized

from her protective mother, placed with her documented abuser, and subjected to fifteen months

of physical, sexual, and emotional abuse.").  That single reference to sexual abuse appears only

in S.C.'s opposition brief, not in S.C.'s amended complaint.  Doc. No. 53-5 at 46.  *See generally*

Doc. Nos. 28, 61.

S.C. was then given another chance to allege she was sexually abused by Couloute from

2017 to 2018 when the court notified counsel in May 2026 that S.C.'s amended complaint

30

referenced S.C. by her full name.  S.C.'s second amended complaint removed that reference yet failed to include any additional allegations regarding sexual abuse by Couloute.  *See, e.g.,* Doc. No. 61 ¶ 196 (stating S.C. "endured verbal, emotional, and physical abuse while living with Couloute" from September 2017 to June 2018).

I was inclined to grant Defendants' motions to dismiss at oral argument.  However, S.C.'s counsel responded to my questioning that he was, indeed, prepared to allege that Couloute abused S.C. while she was in his custody from 2017 to 2018.  That response reeks of bad faith. If I were to accept counsel's seemingly reckless and desperate assertion and permit S.C. to amend her complaint yet again, then the Defendants would have needlessly expended a great deal of time, money, and energy in attacking pleadings that omitted a fundamental factual allegation.  The Defendants would, by this sleight of hand, then be forced to undertake years of discovery defending against a critical factual allegation raised over a year after S.C. initially filed her complaint.

Although I recognize that amendments of the pleadings are to be freely granted, that opportunity is not without limits.  *See Foman v. Davis*, 371 U.S. at 182 (listing potential reasons why leave to amend should not be freely given).  S.C.'s counsel cannot salvage this case by introducing allegations via an unsworn statement at oral argument that S.C. was sexually abused from 2017-2018.  That statement does not carry the presumption of truth afforded to allegations made directly in pleadings, and S.C.'s counsel failed to include those allegations directly in S.C.'s pleadings despite three opportunities to do so.

S.C. experienced profound trauma due to Couloute's actions.  However, the original sexual abuse by Couloute reported in 2014 and 2015 is too attenuated from the Defendants' 2017 conduct for their alleged acts and omission to "cause" sexual abuse.  Therefore, S.C. does not

31

allege that the Defendants' actions resulted in "harm caused by an originating act of sexual abuse, exploitation or assault." *Doe #2*, 337 Conn. at 636; Conn. Gen. Stat. § 52-577d. Accordingly, section 52-577d does not toll the statutes of limitations for S.C.'s state law claims.

           b.    Whether fraudulent concealment or the continuing violation doctrine toll the limitations period for S.C.'s state law claims

S.C. relies on the same arguments to contend that the Defendants' fraudulent concealment tolls the statutes of limitations for both her federal and state law claims. Doc. No. 53-5 at 21-24. As discussed above in section III.A.1.a., *supra*, S.C.'s amended complaint does not plausibly allege that she was ignorant of facts that the Defendants sought to conceal nor does it allege that the Defendants intentionally concealed facts to delay S.C.'s lawsuit. *See Pritsker v. Am. Gen. Life Ins. Co.*, 690 F. App'x 770, 772 (2d Cir. 2017). Therefore, fraudulent concealment tolling under Conn. Gen. Stat. § 52-595 does not apply to S.C.'s state law claims against the Defendants.

Additionally, S.C. argues the continuing violation doctrine applies to her state law claims. Doc. No. 53-5 at 24-25. The same arguments previously discussed in applying the continuing violation doctrine to S.C.'s federal claims apply to S.C.'s state law claims. *See* discussion *supra* Section III.A.1.b. However, Connecticut courts also apply a slight variation on the continuing violation doctrine: the continuing course of conduct doctrine. *See Handler v. Remington Arms Co.*, 144 Conn. 316, 321 (Conn. 1957) ("When the wrong sued upon consists of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed."). In *Fichera v. Mine Hill Corporation*, the Connecticut Supreme Court held that:

> To support a finding of a "continuing course of conduct" that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong.

207 Conn. 204, 209 (1988).  *See also Blanchette v. Barrett*, 229 Conn. 256, 276 (1994) ("[T]he continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied.").

The continuing course of conduct doctrine can toll the statutes of limitations in sections 52-577 and 52-584.  *Martinelli v. Fusi*, 290 Conn. 347, 355-56 (2009) (finding that "the statute of limitations and period of repose contained in [section] 52-584 may be tolled, in the proper circumstances," under the continuous course of conduct doctrine);  *Boains v. Lasar Mfg. Co.*, 330 F. Supp. 1134, 1136-37 (D. Conn. 1971) (applying the continuing course of conduct doctrine to a claim governed by section 52-577).

For the continuing course of conduct doctrine to apply, the plaintiff must allege the defendant:  "(1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to the alleged original wrong; and (3) continually breached that duty."  *Martinelli v. Fusi*, 290 Conn. at 357 (quoting *Witt v. St. Vincent's Medical Center*, 252 Conn. 363, 370 (2000)).

S.C. does not allege the Defendants owe her "a continuing duty . . . that was related to the alleged original wrong" or that they "continually breached that duty" on or after March 21, 2022, three years prior to her filing suit.  *Martinelli v. Fusi*, 290 Conn. at 357 (internal quotation marks omitted) (quoting *Witt*, 252 Conn. at 370); Doc. No. 1.  *See also Fichera*, 207 Conn. at 209 ("[T]here must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto.").  Thus, the continuing course of conduct doctrine does not toll the statute of limitations for S.C.'s state law claims.

Fraudulent concealment tolling, the continuing violation doctrine, and the continuing course of conduct doctrine do not toll the statutes of limitations for S.C.'s state law claims. Therefore, S.C.'s claims in counts eight through thirteen are also time-barred.

## IV.    Conclusion

For the foregoing reasons, the State Defendants' and the Bloomfield Defendants' motions to dismiss for failure to state a claim under Rule 12(b)(6), doc. nos. 45 and 47, are **granted in part with prejudice** and **denied in part without prejudice as moot**.  I **grant in part** the Defendants' motions to dismiss because S.C.'s claims are barred by statutes of limitations.  The Defendants' remaining arguments are **denied in part as moot**.

The Clerk is directed to close the case.

So ordered.

Dated at Bridgeport, Connecticut, this 16th day of July 2026.


/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge